**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SUSIE GARRIT, as administrator of the estate of DARIUS COLE-GARRIT; UNIQUE HATCHET, on behalf of her minor child; DOMONEEC HARRIS, on behalf of her minor child; and FALICIA LEWIS, on behalf of her minor child, | |
| Plaintiffs, | |
| v. | Case No.: 16-cv-7319 |
| CITY OF CHICAGO, an Illinois Municipal Corporation; Officer Matthew O'BRIEN, #10634; Officer James BANSLEY, #10927; | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFFS' MOTION PURSUANT TO F.R.E. 702 AND *DAUBERT* TO PRECLUDE DEFENSE EXPERT, EMANUEL KAPELSOHN, FROM TESTFYING AT TRIAL**

NOW COME Plaintiffs, SUSIE GARRIT, administrator of the estate of DARIUS COLE-GARRIT; UNIQUE HATCHETT, on behalf of her minor child; DOMONEEC HARRIS, on behalf of her minor child; and FALICIA LEWIS, on behalf of her minor child, and bring this motion pursuant to F.R.E. 702 and *Daubert* to preclude Defendants' expert witness, Emanuel Kapelsohn, from testifying or otherwise offering any purported expert opinions at trial. In support thereof, Plaintiffs state as follows:

1

# TABLE OF CONTENTS

I.     BACKGROUND........................................................................................................ 3

II.    STANDARD OF REVIEW........................................................................................ 4

III.   ARGUMENT ............................................................................................................ 5

   A.    Kapelsohn's "Expert Opinion" That His Review Of The Evidence Supports The Officers' Version Of Events Must Be Excluded Because It Invades The Province Of The Jury and Is An Improper Attempt To Bolster The Credibility of Defendants. ...........................................................6
       i.    Autopsy (Ex. A, pp. 7-8)........................................................................................8
       ii.   Inspection of Evidence (Ex. A, pp. 8-9)...............................................................9
       iii.  "Force Science" Based Opinions .........................................................................10
       iv.   The Fact That O'Brien Saw Garrit Point The Gun At Bansley, But Bansley Did Not ...............................13
       v.    Facebook Photograph of Mr. Garrit With Pistol (p. 19)....................................14

   B.    Kapelsohn's Opinion That The Officers' Use Of Deadly Force "Was Such As Other 'Reasonable Officers On The Scene' Would Have Used Under The Same Totality of Circumstances" Must Be Excluded Because It Is An Improper Legal Conclusion. ....................................................15

   C.    Kapelsohn's Opinion That The Officers' Use Of Deadly Force Was "In Keeping With Nationally-Accepted And Nationally-Taught Police Use Of Force Tactics, Standards, And Principles" Must Be Excluded Because It Is Inextricably Intertwined With Credibility Determinations And Legal Conclusions. ..........................................................18

   D.    Kapelsohn's Opinion That The Officers' Use Of Deadly Force Was "Consistent With The Training They Received" From The CPD Must Be Excluded Because It Is Irrelevant And Not Based On Any Reliable Facts Or Data. ..........................................................21

   E.    Kapelsohn's Opinion That The Officers' Use Of Deadly Force Was "Consistent With CPD's Use Of Force Policies" Must Be Excluded Because He Has No Specialized Knowledge On Those Specific Policies That Will Assist The Trier Of Fact In Determining A Fact At Issue In This Case....................22

   F.    Rebuttal Opinion: Other Points Raised In Mr. Waller's Report............................................23
       i.    The DOJ Report Criticizing The CPD's Investigation Of Officer-Involved Shootings Is Irrelevant. (Ex. A, p. 18)23
       ii.   Waller's Criticism About Tactics Used By Officers In Driving Their Vehicle Close To Garrit Is "Waller's Own Opinion, And Nothing More." (Ex. A, p. 18) ..........................................................24
       iii.  Relevancy Of Alleged Tip That People Riding Bicycles Were Transporting Guns In The Neighborhood Is For Court To Decide. (Ex. A, p. 19)..........................................................24
       iv.   Whether Officers Harassing, Threatening, Stalking, Or Pursuing Cole-Garrit Prior To The Incident Is For the Court to Decide. (Ex. A, p. 19) ..........................................................24

IV.    CONCLUSION........................................................................................................ 25

## I.       BACKGROUND

Darius Cole-Garrit ("Cole-Garrit") was fatally shot by Chicago Police Officers Matthew O'Brien ("O'Brien") and James Bansley ("Bansley") (collectively, "Defendants") on August 19, 2014. Susie Garrit, Cole-Garrit's mother and administrator of his estate, filed this action against Defendants pursuant to 42 U.S.C. § 1983, seeking redress for Defendants' unconstitutional use of excessive deadly force against Cole-Garrit. Ms. Garrit, along with Cole-Garrit's three minor children, also seek damages for loss of consortium arising from the death of their son and father, respectively.[1]

Defendants retained Emanuel Kapelsohn to testify as an expert witness on their behalf at trial. Kapelsohn's intended testimony and purported opinions are set out in a 23-page report (the "report"), dated January 30, 2019, along with his curriculum vitae ("CV"), a copy of which is attached hereto as **Exhibit A**; his deposition, taken on March 13, 2019, a copy of which is attached hereto as **Exhibit B**; and his 2-page supplemental report, dated October 8, 2020, a copy of which is attached hereto as **Exhibit C**.

Kapelsohn is a paid expert, lawyer, gun-enthusiast, and firearms instructor who regularly and almost exclusively testifies on behalf of officers and various municipalities. *See* https://www.peregrinecorporation.com/ (describing himself as "a firearms, tactics and use of force expert in trials across the nation, defending use of force cases in federal and state courts, both civil and criminal trials").[2] He is *not* a behavioral psychologist, pathologist, or physiologist.

---

[1] Plaintiffs also maintain a *Monell* claim against the City of Chicago for its own constitutional violations, which has been stayed pending resolution of the claims against the individual defendant officers.

[2] Although Kapelsohn claims to testify as an expert nationwide, his opinions, which more often than not, go well beyond his qualifications, are also regularly excluded in full or in part. *See e.g.*, *Stephens v. Sheriff of Palm Beach County, Florida*, et al., 9:14-cv-80425 (S.D. Fla. 2014); *Commonwealth v. Torres*, 2018 WL 2437969 (Pa. Super. 2018); Jones v. Allen, 2016 WL 9443772 (D. Md. 2016); *Simmons v. Bradshaw*, 2016 WL 3262626 (S.D. Fla. 2016); *Schuoler v. Nanos*, 2015 WL 10436242 (Ariz. Super. 2015) (criminal); *Stephens v. Sheriff of Palm County, Florida et al.*, 9:14-CV-80425 (S.D. Fla. 2014); *Marin-Torres v. Gamo Outdoor USA, Inc.*, 1:14-CV-22122 (S.D. Fla. 2014); *The Estate of Angel Lopez, et al. v. City of San Diego, et al.*, 3:13-CV-02240 (S.D. Cal. 2013); *Schueller*

Nor is he a police officer, something he has never been. "Though he never graduated from a police academy, or worked full-time as a sworn officer, Kapelsohn developed a business that bills itself as 'Specialists in Defense Dynamics,' referring to self defense." *Simmons v. Bradshaw*, 2015 WL 10354116 (S.D. Fla).

There is no need for Kapelsohn's expert testimony in this case. A jury, apprised of the evidence and instructed with regard to the law, is more than capable of deciding the issues in this case without the kind of assistance Kapelsohn intends to offer. Indeed, it is not clear how his opinions differ in any material respect from what the jury will be asked to decide in this case. Because his purported expert opinions are irrelevant, go well beyond his field of expertise, rely on credibility determinations he is not entitled to make, and are so inextricably intertwined with those improper credibility determinations as to render them useless to the jury, he must be precluded from testifying as an expert witness at trial.

## II. STANDARD OF REVIEW

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert*." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Under Rule 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
b. the testimony is based on sufficient facts or data;
c. the testimony is the product of reliable principles and methods; and
d. the expert has reliably applied the principles and methods to the facts of the case.

---

*v. Cordrey*, 2017 Del. Super. LEXIS 68 (Super. Ct. Feb. 15, 2017); *Williams v. Papi*, 3:13-CV-01151 (M.D. Penn. 2016). This Court, having reviewed Kapelsohn's specific qualifications on at least one other occasion, has also found that Kapelsohn is not qualified to render most of the opinions he seeks to render here. See *Chatman v. City of Chicago*, et al., 1:13-CV-05697.

"The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable.").

"The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 804 (7th Cir.2012) (*quoting* Fed.R.Evid. 702). In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the Court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir.2012) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)).

"The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard" by a preponderance of the evidence. *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 798–99 (N.D. Ill. 2013). "Whether to admit expert testimony rests within the discretion of the district court." *Id.* at 798–99.

## III.  ARGUMENT

Defense expert, Emanuel Kapelsohn, seeks to render the following opinions at trial, which he outlined in the conclusion section of his report (Ex. A, pp. 22-23) and reiterated at his deposition (Ex. B, 16:5-17:13):

1) Nothing in the physical evidence and nothing I have observed at the incident scene or in my testing of the involved firearms as fired by the two officers, contradicts or is inconsistent with [the officers'] accounts of what occurred. To the contrary, these things are consistent with their accounts of the incident (Ex. A, p. 22; *see also* Ex B, pp. 16:22-17:6);

2) Provided the involved officers are accurately recounting what they perceived on the night of August 19, 2014, the use of deadly force by Officers O'Brien and Bansley was:

> a. such as other "reasonable officers on the scene" would have used under the same totality of circumstances as confronted them that night (Ex. A, pp. 22-23; *see also* Ex B, p. 17:7-12);
>
> b. in keeping with nationally-accepted and nationally-taught police use of force tactics, standards, and principles (Ex. A, p. 22; *see also* Ex. B, p.16:9-21);
>
> c. consistent with the training they received from the Chicago Police Department (*Id.*); and
>
> d. consistent with the CPD's use of force policies (*Id.*).

Kapelsohn is neither qualified to render these opinions nor are they are sufficiently reliable or relevant to be presented to the jury in this case. For these reasons and the reasons set forth below, Kapelsohn must be precluded from testifying as an expert witness or offering any purported expert opinions at trial.

## A. Kapelsohn's "Expert Opinion" That His Review Of The Evidence Supports The Officers' Version Of Events Must Be Excluded Because It Invades The Province Of The Jury and Is An Improper Attempt To Bolster The Credibility of Defendants.

**Opinion 1:** Nothing in the physical evidence and nothing I have observed at the incident scene or in my testing of the involved firearms as fired by the two officers, contradicts or is inconsistent with [the officers'] accounts of what occurred. To the contrary, these things are consistent with their accounts of the incident.

Kapelsohn's entire report is written with the express goal of supporting the officers' version of events and, in turn, bolstering their credibility. This is entirely improper. "It is well-settled that determining the weight and credibility of witness testimony is the exclusive province

of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of witness testimony." *Sanders v. City of Chicago Heights*, 13 C 0221, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016) (*citing United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury – determining the credibility of witnesses."). Opining that the physical evidence is "consistent with [the officers'] accounts of the incident" improperly bolsters the credibility of the officers and invades the province of the jury, and should be excluded.

In *White v. Gerardot*, for example, the court precluded an expert from testifying that "the wounds to the body strongly support [the detective's] account of the incident, and the subsequent investigation" because such an opinion would improperly bolster the detective's credibility and invade the province of the jury. 1:05-CV-382, 2008 WL 4724004, at *3 (N.D. Ind. Oct. 24, 2008) (citing *Richman v. Sheahan,* 415 F.Supp.2d 929, 941-44 (N.D. Ill. 2006)). The same is true here. The jury is perfectly capable – and solely responsible for – evaluating the evidence and drawing its own conclusions. *See e.g.*, *See Matter of the Complaint of Ingram Barge Co.*, No. 13 C 3453, 2016 WL 3763450, at *10 (N.D. Ill. July 14, 2016) ("Expert testimony does not assist the trier of fact when [it] is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony."); *See also Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at *15 (N.D. Ill. June 5, 2017). Any purported expert opinion that the evidence is consistent with the officers' testimony must be excluded.

To the extent Kapelsohn intends to offer any expert testimony regarding the "physical evidence," his "observ[ations] at the incident scene, "or his "testing of the involved firearms as fired by the two officers," without reaching the improper conclusion that the evidence supports –

or does not contradict – the officers' collective account of what occurred on August 19, 2014, those opinions must be excluded because they are irrelevant, invade the province of the jury or court, are not based on reliable facts or data, and/or he is not qualified to render those opinions, as set forth below:

### i. *Autopsy (Ex. A, pp. 7-8)*

Kapelsohn is not qualified to render any reliable opinion about the evidence to be gleaned from the autopsy report or the implications to be drawn therefrom. He is not a forensic pathologist and has absolutely no experience or training whatsoever that would qualify him to render this sort of opinion. Kapelsohn nonetheless includes an entire section in his report entitled "autopsy" wherein he literally retypes the bullet wound portion of the Cook County Medical Examiner's autopsy report. He then, without any support, concludes that his "cursory inspection of the deceased clothing and footwear indicated bullet defects that were generally consistent with the autopsy report regarding the deceased's bullet wounds." (Ex. A, p. 9). This conclusory and baseless opinion – if it can even be called an opinion – must be excluded. Not only is Kapelsohn utterly unqualified to render this opinion, but it is not based on any reliable methodology and would not help the jury in any meaningful way. Because juries ultimately place a great deal of weight and credibility on expert testimony, this Court should not allow Kapelsohn to testify as to matters for which he is not qualified. Kapelsohn is in no way qualified to provide expert testimony on the subject of bullet wounds and the behavioral characteristics of a bullet as it passes through the human body. He should therefore be precluded from rendering any opinion whatsoever on the autopsy report or its alleged effect on the credibility of the parties or other witnesses.

8

### ii. Inspection of Evidence (Ex. A, pp. 8-9)

Kapelsohn's description of the officers' pistols, his description of the pistol allegedly found 15-20 feet from Cole-Garrit's body, the physical condition of those weapons, and the speed with which a person could theoretically disengage the safety and pull the trigger, are irrelevant, unreliable, and would not help the jury determine a single fact at issue in this case.

First of all, there is no question that Officers O'Brien and Bansley fired their weapons on the night in question. The jury does not need a detailed description of the make, model, and condition of the specific pistols fired by the officers to determine whether those officers were justified in using those weapons to shoot and kill Cole-Garrit on August 19, 2014. Any testimony regarding the specifications of the officers' pistols would be a complete waste of time and would not help the jury determine a single fact at issue in this case.

Nor is there any question that Cole-Garrit did *not* fire a single bullet at officers, or anyone else, before he was shot and killed by Defendants on August 19, 2014. Kapelsohn nonetheless intends to detail for the jury how the pistol found "not far" from Cole-Garrit's body could theoretically be carried "cocked and loaded," despite his admission that it was recovered "with its hammer down (it appears, in the 'half cock' position) and the manual safety engaged." (Ex. A, p. 9). He then backtracks to "note that given the design of this pistol, it can be fired in this condition by someone holding it in a fraction of a second, as the safety can be disengaged (by moving it downward) and the trigger can be pulled simultaneously." (Ex. A, p. 9). None of this is relevant or helpful in any meaningful way. Moreover, because these details were not known to officers at the time of the incident, they have absolutely no bearing on any question at issue in this case.

### iii.  "Force Science" Based Opinions

Kapelsohn is not qualified to render any opinions in the so-called field of "force sciences," which he describes as "the application of scientific principles, research and testing to confrontations in which force is used by police officers or others." *Jones v. Allen*, CV PX-15-1173, 2016 WL 9443772, at *3 (D. Md. Oct. 24, 2016). More specifically, so-called "[f]orce science involves such things as an individual's perception and evaluation of deadly threats, human factors such as reactions times, the speed with which one can cover a certain distance on foot, turn, draw and/or fire a gun, the speed at which multiple shots can be fired ... and the perceptual and physiological changes commonly experienced by individuals during high-stress use of force confrontations, sometimes described as part of the 'fight or flight' or 'Body Alarm Reaction (BAR) responses.'" *Id.* (internal quotation marks omitted). Kapelsohn, however, is not a psychologist nor does have any science-based education or training. He is patently unqualified to render any opinions on human perception or the "perceptual and psychological changes" experienced by an individual in high stress situations, or any other related opinions. *Id.*

In *Jones*, for example, Kapelsohn sought to offer his "expert opinion" to an impressionable jury that "the Officers, firing their weapons under an intensely stressful situation, could reasonably keep shooting even when they were no longer in danger." *Id.* "To undergird this opinion, Mr. Kapelsohn discusse[d] in conclusory fashion the human effects of high-stress events and the biomechanics of life and death shooting incidents." *Id.* "Mr. Kapelsohn state[d] that given the complex set of human factors at play, it is 'quite possible' that [one of the defendant officers] could have fired six shots at the vehicle in 1.5 seconds, and [another defendant officer] could have fired three shots in .5 seconds." *Id.* Additionally, "[i]n his supplemental report, Mr. Kapelsohn measure[d] how much time it takes the Officers to fire the

10

same number of shots that they did at the scene." *Id.* The court rejected Kapelsohn's proposed

testimony, reasoning as follows:

> Putting to one side the inherent problems with an opinion regarding 'possibilities,' or based on testing performed in conditions vastly different than those at the scene, Mr. Kapelsohn provides no scientific or methodologically sound foundation to support an opinion regarding the complex human factors that may have affected the officers on-the-scene shot times. Nor have Defendants established that Mr. Kapelsohn's training and experience in the field of 'force-science' can meet the *Daubert* standard.

> First with regard to Mr. Kapelsohn's training and qualifications, they are wholly inadequate for those areas of offered expertise. Mr. Kapelsohn has no formal education, training or experience in the fields of engineering, biomechanics, psychology or human factors analysis. Rather, he possesses a single "certification" as a "force sciences analyst" which he received after taking a three and half day course and paying the $1500 course fee to the Force Sciences Institute. According to the Institute's website, admission is open to anyone who pays the membership fee. After completing this course, Mr. Kapelsohn holds himself out to be qualified to render opinions regarding Defendant officers' "reaction times" when faced with the "stress" of an oncoming vehicle. ECF No. 39–3 at 10.

> To undergird his opinion that the officers' likely could not have stopped shooting at the vehicle, he intends to opine on such complex biomechanical stress phenomena of "auditory exclusion" "distorted perceptions" "tunnel vision" "adrenaline dump" and time distortions which purportedly occur during shooting events. ECF No. 39–3 at 12. But without any formal education, training or experience aside from the force sciences institute course and anecdotal evidence gleaned from discussions with officers, Mr. Kapelsohn lacks the requisite qualifications to render an opinion in this regard.

> Second with respect to Mr. Kapelsohn's ultimate opinions, he provides no reasonably sound scientific methodology or foundation establishing the basis for such opinions. He can point to no reasonably reliable scientific work on which he relies; he does not demonstrate how the experience, training and education that *he* has amassed is in a field subject to peer review, guided by existing standards, or achieved 'general acceptance' in the relevant scientific or expert community. *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (*quoting Daubert*, 509 U.S. at 593–94).

> …Based on this slim record regarding Mr. Kapelsohn's place in the field of 'force science,' this Court cannot find Mr. Kapelsohn's opinions sufficiently reliable to render them admissible under *Daubert* or Rule 702.

*Id*. at *4.

This analysis applies with equal force to this case. Here, like in *Jones*, Kapelsohn intends

to offer testimony about the effect of officers in "highly stressful" situations. Ex. A, p. 16. The

sections in Kapelsohn's report entitled "Action vs. Reaction" (Ex. A, pp. 13-14); "Shooting to 'Stop the Threat'" (p. 15-16), and "Electronic Timing…And Ejection Pattern Testing Of The Officers Firing Similar Pistols" (pp. 20-21) must therefore be excluded in full.

As to the "ejection pattern testing" of the officers' firearms, Kapelsohn's opinion regarding the speed with which officers "could have" fired their weapons is neither reliable nor relevant to any aspect of this case. In fact, by requesting an opportunity to "do ejection pattern testing with the officers' actual incident pistols in order to properly respond to any newly-raised issues" by Plaintiff, Kapelsohn all but admits his testing of "similar firearms" is not sufficiently reliable to present to a jury. (Ex. A, p. 22). If it was, in fact, necessary for Kapelsohn to have the actual incident pistols to render a reliable opinion, then his failure to conduct any such further testing in the year since the guns were returned to officers illustrates the irrelevance of this testimony and the unreliability of his purported opinions based on the firing of "similar" weapons. Even after Kapelsohn was given permission to supplement his report long after the deadline had passed, he did not pursue any additional testing of the actual firearms. Accordingly, any opinions arising out of Kapelsohn's testing of "similar weapons" are irrelevant, unreliable, and must be excluded.

Even assuming, *arguendo*, these opinions have some minor relevance, they must be excluded based on representations explicitly made by the defense to this Court. In support of their motion for return of the defendant officers' firearms, filed on November 20, 2019, the defense represented that "[i]t is undisputed that on August 19, 2014, Officers O'Brien and Bansley fired their weapons at Mr. Cole-Garrit[,]" and that "**[s]aid firearms hold no evidentiary value in this case**…" (Dkt. 166, ¶ 2, 4) (emphasis added). The Court granted

12

Defendants' motion based on this representation. All purported opinions regarding the speed with which officers could or could not have fired their weapons must, therefore, be excluded.

### iv. The Fact That O'Brien Saw Garrit Point The Gun At Bansley, But Bansley Did Not (p. 16-18)

In a further attempt to explain away any inconsistencies in the officers' testimony, Kapelsohn includes an entire section in his report titled "The Fact That O'Brien Saw Garrit Point The Gun At Bansley, But Bansley Did Not." (Ex. A, pp. 16-18). Kapelsohn has absolutely no qualifications whatsoever to render any reliable opinion as to why O'Brien claims to have seen Cole-Garrit point a gun at Bansley, but Bansley did not. Any purported testimony or reference to various psychological studies and phycological phenomena that occur in high stress situations is wholly outside his expertise. (Ex. A, pp. 16-18). He is neither psychologist nor an expert on human perception. Though he claims to be a "Force Science Analysist and Advanced Specialist in Force Science," he has absolutely no qualifications to support this self-proclaimed specialty. (Ex. A, p. 4). His purported "expert opinion" that these phenomena occurred in previous cases he has worked does not qualify him to render that same opinion here. (Ex. A, pp. 16-18).

Even if Kapelsohn was qualified to render this sort of opinion (he is not), Kapelsohn fails to draw any reasonable connection between that opinion and the facts of this case that would demonstrate any of these psychological phenomena actually occurred here.

In any case, as Kapelsohn himself admits, "it is *widely known* officers and others in the stress of life-and-death confrontations commonly experience changes in their normal perceptual abilities." (Ex. A, p. 16) (emphasis added). Thus, even if he was qualified to render this opinion (again, he is not), no expert testimony is needed to convey "widely known" facts to the jury. The jury does not need an expert to tell them that "[i]t is not surprising that…Officer O'Brien testified he saw Garrit point the pistol at Officer Bansley, but Bansley did not see this;" that the

13

officers were "viewing Garrit from two different angles and perspectives, and therefore can be expected to have been able to see different things;" or that "[a]s Garrit ran and Bansley pursued him, Bansley's view of Garrit was at various times blocked by the police car, and trees." (Ex. A, p. 16).[3] Nor is it helpful for the jury to hear Kapelsohn's series of opinions on what "could have" happened that would cause Bansley to temporarily lose sight of Cole-Garrit. *Id.* Indeed, Kapelsohn's opinion as to what "could have" been obstructing Bansley's view is based on nothing but pure speculation and is neither reliable nor helpful to the jury. The jury does not need expert testimony to explain to them the possibility of a tree obstructing the officer's vision. The jury can and must decide this for themselves.

### v. *Facebook Photograph of Mr. Garrit With Pistol (p. 19)*

Next, Kapelsohn purports to offer his "expert opinion" that it is "highly likely that the gun that can be seen in [Cole-Garrit]'s waistband on Facebook is the same gun recovered not far from his body at the incident scene." (Ex. A, p. 19). In support of this purported opinion, Kapelsohn attempts to link the half-visible, blurry Facebook photograph of a gun in Cole-Garrit's waistband, to the gun found at the scene by comparing the visible, physical characteristics of each. (Ex. A, p. 19). The jury, however, is perfectly capable of looking at the same Facebook photograph and deciding for themselves what the evidence shows. This is simply another improper attempt to bolster the credibility of the officers, while discounting the eyewitness testimony of Emmanuel Spann, who testified that Cole-Garrit did not have a gun in his possession at the time, let alone point a gun at officers.

---

[3] Although Kapelsohn claims to be a "shooting scene reconstructionist," (Ex. A, p. 4), he explicitly denies that he intends to do any accident reconstruction or forensic science reconstruction "other than the timing tests and ejection pattern tests," which he does not consider "scene reconstruction." (Ex. B, p. 23:5-15).

14

Kapelsohn nonetheless notes, in further support of his opinion, that the Facebook photograph was posted on the same day Cole-Garrit was killed by police, and details information "learned" during a phone call with the manufacturer of the gun found at the scene (for which he has no independent knowledge or expertise). *Id.* Kapelsohn then attempts to step into the shoes of the jury, weigh this evidence, and offer his "expert opinion" that these "details… further increase the likelihood that the pistol seen in Mr. Garrit's waistband in the Facebook post is, in fact, the same gun recovered not far from his body at the incident scene, and make it highly unlikely that the pistol recovered at the scene was 'planted' there by the CPD." *Id.* These purported opinions, however, are not based on any reliable methodology within the purview of Kapelsohn's expertise, are not made to a reasonable degree of scientific certainty, and blatantly invade the province of the jury. The jury can and must decide what weight, if any, should be afforded to this "evidence," if admitted. Kapelsohn's blatant attempt to invade the province of the jury must be precluded.

Finally, in yet another attempt to support his wholly improper opinion that "[i]t clearly appears from the evidence that [Cole-Garrit] was carrying the gun that was recovered at the scene," Kapelsohn "notes" that Cole-Garrit's stepfather testified that he "found a loaded semi-automatic pistol ("not a revolver") in [Cole-Garrit]'s bedroom, and threw [Cole-Garrit] out of the house as a result." (Ex. A, p. 19-20). This testimony is wholly and entirely improper and must be excluded.

**B. Kapelsohn's Opinion That The Officers' Use Of Deadly Force "Was Such As Other 'Reasonable Officers On The Scene' Would Have Used Under The Same Totality of Circumstances" Must Be Excluded Because It Is An Improper Legal Conclusion.**

**<u>Opinion 2(a)</u>:** Provided the involved officers are accurately recounting what they perceived on the night of August 19, 2014, the use of deadly force by officers O'Brien and Bansley against Mr. Garrit was such as other "reasonable officers on the scene" would have used under the same totality of circumstances as confronted them that night.

Kapelsohn's opinion that the officers' use of deadly force "was such as other 'reasonable officers on the scene' would have used under the same totality of circumstances" must be excluded because it is nothing more than an improper legal conclusion. In fact, his entire report is riddled with impermissible legal conclusions, opinions, case law, and irrelevant "examples" of how various legal (and psychological) principles apply to other cases Kapelsohn has "worked" on in some capacity. This is not the type of testimony an expert witness is permitted to offer.

"As a general rule, an expert cannot offer legal opinions or conclusions." *Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at \*15 (N.D. Ill. June 5, 2017); See also *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) ("Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *Client Funding Solutions Corp. v. Crim,* 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact."). Although Rule 704(a) "states that '[a]n opinion is not objectionable just because it embraces an ultimate issue,'" Rules 702 and 704, "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc. v. N.L.R.B.,* 674 F.3d 638, 648 (7th Cir. 2012); see also *King v. Kramer*, 763 F.3d 635, 646 (7th Cir. 2014). The jury will be instructed as to the applicable legal standards and will be solely responsible for determining the weight and credibility to be given to any witness testimony. *Sanders v. City of Chicago Heights*, 13 C 0221, 2016 WL 4417257, at \*5 (N.D. Ill. Aug. 19, 2016). Any questions of law will be resolved by the court and are not the appropriate subject of expert testimony. See *Jordan v City of Chicago*, No. 08 CV 6902, 2012 WL 88158 (N.D. Ill. Jan. 11, 2012) (internal citations and quotation marks omitted).

In *Thompson v. City of Chicago*, for example, the Seventh Circuit affirmed the district court's decision to exclude the plaintiff's experts from testifying that the defendant police officer used excessive force, articulating as follows:

> The jury, after having heard all of the evidence presented, was in as good a position as the experts to judge whether the force used by the officers to subdue Thompson was objectively reasonable given the circumstances in this case. Introducing two experts to testify that [the officer] used excessive force would have induced the jurors to substitute their own independent conclusions for that of the experts. In other words, they would have been 'induced to decide the case on an improper basis…rather than on the evidence presented…,' which is precisely why the evidence should have been excluded.

472 F.3d 444, 458 (7th Cir. 2006) (internal citations omitted).

Here, the jury will be tasked with deciding whether or not, based on the evidence presented at trial, the officers' use of deadly force when they shot and killed Cole-Garrit was objectively reasonable under the circumstances. Kapelsohn's purported opinion that the officers' "use of deadly force was such as other reasonable officers on the scene would have used under the same totality of circumstances as confronted them that night" is nothing more than an impermissible legal conclusion that invades the province of the jury. *See* Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2008) (explaining that opinion testimony should be excluded for lack of helpfulness where it "supplies the jury with no information other than the witness's view of how the verdict should read"). For these reasons, any and all legal conclusions, opinions, or other testimony that invades the province of the court must be excluded. This specifically includes, but is not limited to, the sections in Kapelsohn's report titled "Standard and Training Applicable to an Officer's Use of Deadly Force" (Ex. A, p. 9), "Threats of Imminent Harm vs. Immediate Harm" (Ex. A, pp. 11-12), "Elements of Justification" (Ex. A, pp. 10-11), and "The Officer's 'Reasonable Belief' Is The Applicable Standard, And Is The Standard In Which Police Are Trained." (Ex. A, pp. 12-13).

17

**C. Kapelsohn's Opinion That The Officers' Use Of Deadly Force Was "In Keeping With Nationally-Accepted And Nationally-Taught Police Use Of Force Tactics, Standards, And Principles" Must Be Excluded Because It Is Inextricably Intertwined With Credibility Determinations And Legal Conclusions.**

**Opinion 2(b):** Provided the involved officers are accurately recounting what they perceived on the night of August 19, 2014, the use of deadly force by officers O'Brien and Bansley against Mr. Garrit was in keeping with nationally-accepted and nationally-taught police use of force tactics, standards, and principles.

Plaintiffs acknowledge, as a general principle, that expert testimony on generally accepted police practices may be helpful to the jury. Because Kapelsohn's purported testimony is inextricably intertwined with credibility determinations and legal conclusions, however, it must be excluded. See *Sanders v. City of Chicago Heights*, 13 C 0221, 2016 WL 4417257, at *5 (N.D. Ill. Aug. 19, 2016) ("It is well-settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of witness testimony."); *United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury – determining the credibility of witnesses."); see also *United States v. Scheffer,* 523 U.S. 303, 313 (1998) ("Determining the weight and credibility of witness testimony [ ] has long been held to be the 'part of every case [that] belongs to the jury.'") (citation omitted); *United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009) ("it is the jury's role to determine the credibility of the witnesses and weigh the evidence.").

Because each and every one of Kapelsohn's opinions are based on his improper conclusion that the evidence supports the officers' collective "accounts of what happened," and his assumption, based on that conclusion, that "the involved officers are accurately recounting what they perceived on the night of August 19, 2014," he must be precluded from testifying at

18

trial. In other words, because Kapelsohn seeks to opine that the physical evidence and his limited "testing" supports the officers' version of events, his remaining opinions are so inextricably intertwined with this improper credibility determination that they are rendered essentially useless. Expert opinion that is intertwined inextricably with, and rests on improper credibility determinations, is not admissible. *See Jordan v City of Chicago*, No. 08 CV 6902, 2012 WL 88158 (N.D. Ill. Jan, 11, 2012) (citations omitted) (determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of that testimony). "Expert testimony that rests solely on 'subjective belief or unsupported speculation' is not reliable, and not admissible." *Daubert*, 509 U.S. at 590.

Even in the face of conflicting evidence, Kapelsohn steadfastly refuses to reconsider or objectively reevaluate his opinions and conclusions based on any set of facts which do not comport with the officers' collective version of events, even where those versions conflict with one another. "An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003). An expert who acts as an advocate is not an expert at all. Indeed, "'[w]hen expert witnesses become partisans, objectivity is sacrificed to the need to win.'" *Cacciola v. Selco Balers, Inc.,* 127 F.Supp.2d 175, 184 (E.D.N.Y. 2001) (quoting *Rubinstein v. Marsh,* No. CV–80–0177, 1987 WL 30608, at *7 (E.D.N.Y. Dec.19, 1987)). Because Kapelsohn refuses to – or is otherwise incapable of – objectively evaluate this case and render an expert opinion, he must be precluded from testifying at trial.

At his deposition, for example, Kapelsohn testified that officers are justified in firing at someone who points a gun at them, provided that he knew they were officers and "weren't

19

robbing him or something else." (Ex. B, 22:13-14). When questioned about his apparent conclusion that Cole-Garrit "knew" the defendants were police officers, he claimed simply that because "most" people know what an undercover police vehicle looks like and refused to consider any scenario that would contradict his factual conclusions and ultimate opinions that the defendant officers were justified in using deadly force against Cole-Garrit. This is, of course, despite later admitting he cannot speculate about what Garrit "thought in his own mind." (Ex. B, 80:1-5).

Despite this admission, however, he refused for the entire deposition to state whether or not officers would have been justified in firing at Cole-Garrit if he did not have reason to know they were officers. Kapelsohn's refusal to consider even the possibility that Cole-Garrit did not know they were officers the first time he allegedly pointed a gun at their vehicle, or the effect that would have on his ultimate conclusion, demonstrates his inherent biases and unreliability. He is not qualified to render an opinion as to whether or not Cole-Garrit could readily identify an undercover, speeding Tahoe, at 9:30 at night, as a police vehicle. Nor is he qualified to render any opinion that "most" people can recognize an undercover police vehicle as a police vehicle.

In perhaps the most egregious example of the improper credibility determinations made and relied on by Kapelsohn in rendering and reaffirming his opinions, Kapelsohn flatly rejects any of Emmanuel Spann's eyewitness testimony and boldly claims that his testimony has no bearing on his opinion that the officers were justified in firing. (Ex. C, pp. 1-2). Kapelsohn continues to ignore the possibility that Cole-Garrit did not know the car approaching was a police vehicle or that Cole-Garrit either did not have a gun on him or did not point it at officers before he was shot and killed. *Id.* Indeed, even after Spann testified that Cole-Garrit did not have a gun on him that night, Kapelsohn continues to assert that "[t]he issues in this case have to do

primarily with the actions of Mr. Garrit <u>while running with a gun in his hand</u> that either justified, or did not justify, the police in firing, and as to those issues Mr. Spann has little or nothing to offer, as he didn't see that part of the incident." (Supp. Ex. A, p. 1) (emphasis added). By plainly framing the issue as one that completely disregards Spann's testimony in favor of the officers' collective testimony, and refusing to even consider the effect Spann's testimony would have on his opinions and ultimate conclusions, Kapelsohn improperly invades the province of the jury and must be precluded from testifying at trial.

In fact, although Kapelsohn claims it will be up to the jury to determine the credibility of witnesses, he nonetheless explains that his conclusion is unaffected by Spann's testimony and notes the following "[w]ith regard to [Spann's] credibility":

> …I note that Mr. Spann's criminal history includes robbery, for which he spent one year in jail in Cook County, burglary, for which he pled guilty and was sentenced to four years in prison and had to do two years with the Illinois Department of Corrections, then "UUW" (unlawful use of a weapon) for which he was sentenced to six years, and most recently for first degree murder and conspiracy, for which he was found guilty in Iowa and is currently imprisoned….

(Ex. C, p. 2).

This testimony goes way beyond the scope of his expertise and role as an expert witness. Because Kapelsohn's purported opinions cannot be readily distinguished from his credibility determinations, whether implicit or explicit, they must be excluded as an improper attempt to invade the province of the jury and/or tell an impressionable jury what conclusion they should reach.

**D. Kapelsohn's Opinion That The Officers' Use Of Deadly Force Was "Consistent With The Training They Received" From The CPD Must Be Excluded Because It Is Irrelevant And Not Based On Any Reliable Facts Or Data.**

**Opinion 2(c):** Provided the involved officers are accurately recounting what they perceived on the night of August 19, 2014, the use of deadly force by Officer's O'Brien

and Bansley against Mr. Garrit was consistent with the training they received from the Chicago Police Department.

This opinion must be excluded in full. Kapelsohn has no idea what training Officers Bansley or O'Brien actually received from the CPD and did not review a single training record for either officer before rendering his opinion. (Ex. A, pp. 1-2). Kapelsohn's "opinion" that the officers' use of deadly force was "consistent with the training they received" from CPD is, therefore, pure speculation and not based on any reliable facts or data whatsoever.

Even if Kapelsohn was qualified to render this purely speculative opinion, because Plaintiffs' *Monell* failure to train claim has been stayed by agreement, any testimony regarding the training allegedly received – or not received – by defendant officers is irrelevant and will not assist the jury in determining a single fact at issue in this case.

### E. Kapelsohn's Opinion That The Officers' Use Of Deadly Force Was "Consistent With CPD's Use Of Force Policies" Must Be Excluded Because He Has No Specialized Knowledge On Those Specific Policies That Will Assist The Trier Of Fact In Determining A Fact At Issue In This Case.

**Opinion 2(d):** Provided the involved officers are accurately recounting what they perceived on the night of August 19, 2014, the use of deadly force by Officer's O'Brien and Bansley against Mr. Garrit was consistent with the CPD's use of force policies.

This opinion must also be excluded in full. As Kapelsohn explicitly states in his report, he is only "generally familiar with CPD use of force policies an Illinois use of force law from [his] work in previous cases." (Ex. A, p. 2). Kapelsohn's work as an expert witness in prior cases and his review of "these standards" and Illinois law does not in any way qualify him to testify as an expert witness with respect to CPD's use of force policies or the officers' alleged compliance with them.

Even if Kapelsohn was qualified to render an opinion on CPD's use of force policies, his single reference to CPD's General Order G03-02-03, entitled "Deadly Force," which states that

"[a] sworn member is justified in using force likely to cause death or great bodily harm only when he or she reasonably believes that such force is necessary…to prevent death or great bodily harm to the sworn member or another person," is not at all helpful to the jury. That officers acted in accordance with this "policy" or Illinois self-defense law "provided [the officers] are accurately recounting what they perceived" that night will add nothing of substance to the trial and will serve only to improperly influence and instruct the jury on the conclusion Kapelsohn believes they should reach. This should be permitted. The court is perfectly capable of instructing the jury as to the applicable law and Kapelsohn's purported opinion that the officers acted in compliance with this alleged "policy" will add nothing of substance to the trial and will only open the door for Plaintiffs to present evidence of the City's failure to train, which has been stayed. To the extent this has any relevance whatsoever, it is duplicative of Kapelsohn's opinion that the officers' conduct was consistent with national standards.

### F. Rebuttal Opinion: Other Points Raised In Mr. Waller's Report

Not one of Kapelsohn's purported rebuttal opinions are admissible as they interject improper legal opinions, conclusions, and relevancy determinations that rest squarely within the sound discretion of the court. These improper rebuttal opinions outlined in Kapelsohn's report can be described as follows and must be excluded:

    *i.       The DOJ Report Criticizing The CPD's Investigation Of Officer-Involved Shootings Is Irrelevant. (Ex. A, p. 18)*

Whether particular evidence is "relevant" is a task for the Court to decide, not Defendants' paid expert witness. Kapelsohn must not be permitted to comment on the purported relevancy (or irrelevancy) of any evidence as it clearly goes beyond the role of an expert witness and invades the province of the court.

ii. ***Waller's Criticism About Tactics Used By Officers In Driving Their Vehicle Close To Garrit Is "Waller's Own Opinion, And Nothing More." (Ex. A, p. 18)***

Again, both the relevancy and reliability of expert opinion is for the court to decide, not Defendants' paid expert witness. Any purported testimony that Waller's expert opinion does not meet the standards of admissibility outlined in Rule 702 and Daubert mut be excluded.

iii. ***Relevancy Of Alleged Tip That People Riding Bicycles Were Transporting Guns In The Neighborhood Is For Court To Decide. (Ex. A, p. 19)***

Once again, Kapelsohn states no meaningful or reliable rebuttal opinion other than his improper conclusion that "[i]t clearly appears from the evidence that [Cole-Garrit] was carrying the gun that was recovered at the scene," and that the likely-fabricated (and admittedly not documented) "tip" to officers that "people riding bicycles were transporting guns in the neighborhood" is irrelevant to a determination of whether officers "were justified in firing at him in their own defense." (Ex. A, p. 19). Although Kapelsohn may wish to assume the role of the court, just as he presumes to assume the role of a psychologist, he is not entitled to determine whether or not evidence is relevant. This purported opinion must also be excluded. Kapelsohn, however, ignores any evidence that negates the officers' version of events. He did not consider that this "tip" or the alleged information of the tip was not explained in the same way by any of the Defendants.

iv. ***Whether Officers Harassing, Threatening, Stalking, Or Pursuing Cole-Garrit Prior To The Incident Is For the Court to Decide. (Ex. A, p. 19)***

Finally, Kapelsohn again uses his "supplemental report," which offers no relevant or reliable expert opinions whatsoever, to explain the Fourth Amendment's use of force standard and offer his "opinion" that the officers' reported death threats made to Cole-Garrit earlier that day are "irrelevant" to this case. Again, Kapelsohn is not in a position to explain law to the

24

jury or provide expert opinion of what evidence is or is not relevant. This is exclusively for the Court to decide.

Because not a single one of the aforementioned rebuttal "opinions" is within the scope of admissible expert testimony, but is instead an improper attempt to fill the shoes of the court, his alleged rebuttal opinions set forth herein must be excluded.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court exclude in full the purported opinions of Defendants' retained expert witness, Emanuel Kapelsohn, and preclude him from testifying at trial.

Respectfully submitted,

*/s/ Matthew Amarin*
Matthew Amarin
Christina Smedley
Haytham Faraj
**LAW OFFICES OF HAYTHAM FARAJ**
1935 W Belmont Ave.
Chicago, IL 60657
312-635-0800
matthew@farajlaw.com

**EXHIBIT LIST**

**Exhibit A**: Emanuel Kapelsohn's Rule 26 Expert Report and CV

**Exhibit B**: Deposition of Emanuel Kapelsohn

**Exhibit C:** Emanuel Kapelsohn 's Supplemental Rule 26 Expert Report

## CERTIFICATE OF SERVICE

I, the undersigned attorney, certify that on March 31, 2021, I electronically filed the above document with the Clerk of the Court via CM/ECF filing system.


*/s/ Matthew Amarin*