## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SUSIE GARRIT, as administrator of the estate of DARIUS COLE-GARRIT; et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 16-cv-7319 |
| v. | ) ) | District Judge Robert W. Gettleman |
| CITY OF CHICAGO, et al. | ) ) | Magistrate Judge Jeffrey I. Cummings |
| Defendants. | ) ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Susie Garrit, as administrator of the estate of Darius Cole-Garrit ("Cole-Garrit"); and plaintiffs Unique Hatchett, Domoneec Harris, and Falicia Lewis (each on behalf of their minor children) brought suit against defendants City of Chicago and officers Matthew O'Brien and James Bansley alleging their constitutional rights were violated when defendant officers fatally shot Cole-Garrit.[1]  Before the Court is plaintiffs' motion to exclude testimony by Emanuel Kapelsohn, an expert retained by defendants.  (Dckt. #212).  Defendants filed a response (Dckt. #216), to which plaintiffs replied (Dckt. #217).  For the reasons stated below, plaintiffs' motion is granted in part and denied in part.

### I.     BACKGROUND

On August 19, 2014, Chicago Police Department officers James Bansley, Matthew O'Brien, Kyle Burg, and Ronny Sturm were on patrol in an unmarked police SUV when they saw Cole-Garrit standing on the street.  (Dckt. #26 at 9).  As the officers drove in his direction,

---

[1] Plaintiffs also allege a loss of consortium and assert a *Monell* claim against the City of Chicago – alleging the city maintains a policy of failing to properly train, supervise, discipline, or control its officers. The latter has been stayed pending resolution of the charges against the individual defendants.

Cole-Garrit began to run away. The officers then exited the vehicle and began chasing Cole-Garrit on foot. (*Id.* at 10). As the officers ran, O'Brien fired his service weapon at Cole-Garrit either ten or eleven times and Bansley fired at Cole-Garrit five times. (*Id.*). Cole-Garrit was hit multiple times and died from nine gunshot wounds. (*Id.*).

The above facts are not contested. Regarding the details of the encounter, however, accounts of the eyewitnesses diverge. According to the officers, as their vehicle approached Cole-Garrit, he reached into his waistband, pulled out a pistol, and pointed it in their direction. (Dckt. #212-1 at 8). Conversely, Emmanuel Spann, who was reportedly "standing right there" when the officers arrived, maintains that he never saw Cole-Garrit point a gun at the officers. (Dckt. #216-3 at 3). Additionally, while O'Brien asserts that Cole-Garrit pointed a gun at Bansley a second time as the officers gave chase, Bansley does not. (Dckt. #212-1 at 18). Both officers have stated that a loaded 9mm semi-automatic Taurus pistol was found approximately twenty feet from Cole-Garrit's body. (Dckt. #212-2 at 12).

Plaintiffs filed this lawsuit on July 18, 2016. Defendants have since retained Kapelsohn, a firearms and tactics instructor, to provide expert testimony regarding whether the officers' use of deadly force was reasonable. Kapelsohn is a practicing attorney with a bachelor's degree in English Literature. (Dckt. #212-1 at 29). He has never worked as a police officer, although he has served as an "armed reserve deputy sheriff" and has designed and led training programs for several police departments on various subjects, including use of force. (*Id.* at 5, 30-35). He has extensive firearms training. (*Id.* at 35-45). In the instant motion, plaintiffs seek to entirely preclude Kapelsohn from offering expert testimony at trial.

## II.    LEGAL STANDARD

### A.    Admissibility of expert testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017). Rule 702 delegates to district courts the responsibility of ensuring that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 598. When fulfilling this gatekeeping role, courts evaluate: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis in original).

Regarding the first prong, a witness may be qualified to testify based on relevant knowledge, skill, experience, training, or education. Fed.R.Evid. 702, Advisory Committee Notes. "The Court 'must look at each of the conclusions [an expert] draws individually to see if he has the adequate education, skill, and training to reach them.'" *Webster Bank, N.A. v. Pierce & Assocs. P.C.*, No. 16-cv-2522, 2020 WL 616467, at *3 (N.D.Ill. Feb. 10, 2020), *quoting Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). As to the second prong, expert opinions are sufficiently reliable when they are based on sound methodology and can be properly applied to the facts. *Daubert*, 509 U.S. at 592-93. This inquiry is "'necessarily flexible' and the court has broad latitude in its determination of reliability." *Estate of Damiani v. Allen*, 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at *5 (S.D.Ind. Aug. 28, 2018), *quoting Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *8 (W.D.Wisc. Feb. 13, 2017). Finally, to be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

The proponent of the expert bears the burden of establishing the admissibility of his opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mutual Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). Whether to admit expert testimony rests within the discretion of the court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

## III. ANALYSIS

### A. Excessive force claims under the Fourth Amendment

The Fourth Amendment prohibits officers from using excessive force during an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989). When an officer is accused of using excessive force, the decisive question is whether the officer's conduct was "objectively reasonable in light of the totality of the facts and circumstances confronting him or her, without regard for consideration of the officer's subjective intent or motivations." *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015). Simply put, courts ask whether, in light of the circumstances, the officer "used greater force than was reasonably necessary to effectuate the seizure." *Id.* The circumstances to be considered in an excessive force claim include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Graham*, 490 U.S. at 396. The Supreme Court has found it is reasonable for an officer to use deadly force, as the officers did in this case, if "an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others." *Marion v. City of Corydon, Indiana*, 559 F.3d 700, 705 (7th Cir. 2009) (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)).

### B. Kapelsohn's proposed opinions

In his report (Dckt. #212-1), Kapelsohn summarizes his opinions as follows:

(1)  Provided the involved officers are accurately recounting what they perceived on the night of August 19, 2014, the use of deadly force by Officers O'Brien and Bansley was:

   (a) in keeping with nationally-practiced and nationally-taught police use of force tactics, standards, and principles;

   (b) consistent with the training they received from the Chicago Police Department; and

   (c) consistent with the CPD's use of force policies.

(2) Nothing in the physical evidence, and nothing I have observed at the incident scene or in my testing of the involved firearms as fired by the two officers, contradicts or is inconsistent with their account of what occurred. To the contrary, these things are consistent with their accounts of the incident.

(3) Provided the officers are accurately describing what they perceived during the incident, their use of deadly force was such as other "reasonable officers at the scene" would have made under the same totality of circumstances as confronted them that night.

(*Id.* at 24-25).

### C.  Kapelsohn may testify at trial regarding national police practices, the capabilities of various firearms, and the timed tests he performed with defendant officers.

Plaintiffs seek to entirely preclude Kapelsohn from testifying at trial, claiming his opinions are "irrelevant, go well beyond his field of expertise, rely on credibility determinations he is not entitled to make, and are so inextricably intertwined with those improper credibility determinations as to render them useless to the jury." (Dckt. #212 at 4). As noted above, courts apply a three-part test when applying the *Daubert* framework to proposed Rule 702 evidence. For expert testimony to be admissible: (1) the witness must be qualified to render the opinion at issue; (2) the methodology underlying the opinion must be scientifically reliable; and (3) the proposed testimony must assist the trier of fact in understanding the evidence or determining an issue of fact. *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Although

plaintiffs are correct that most of Kapelsohn's opinions fail to meet one or more of these criteria, the Court must look at each of an expert's conclusions individually. *Hall*, 840 F.3d at 926. In doing so, the Court concludes that a portion of Kapelsohn's proposed testimony meets the three-part test under *Daubert* and Rule 702.

### 1.    Kapelsohn may testify regarding how nationally accepted police practices apply to hypotheticals supported by the evidence.

The excessive-force inquiry is governed by constitutional principles, rather than police department policies or standards. *See, e.g., United States v. Brown*, 871 F.3d 532, 535-37 (7th Cir. 2017) ("[A] police officer's violation of departmental policy is completely immaterial [on] the question . . . whether a violation of the federal constitution has been established.") (internal quotation marks omitted). Even so, the Seventh Circuit has found that evidence of general, nationally recognized police practice or procedure may be relevant to the question of reasonableness "in cases where specialized knowledge of law-enforcement custom or training would assist the jury in understanding the facts or resolving the contested issue." *Id.* at 537. For example, in cases where defendant officers used equipment that the average layperson is unfamiliar with, a jury would likely find testimony about how officers are trained to use such equipment to be helpful. *Florek v. Village of Mundelein*, 649 F.3d 594, 602 (7th Cir. 2011) (finding expert testimony is more likely to assist the trier of fact "when something peculiar about law enforcement (e.g., the tools they use or the circumstances they face) informs the issues to be decided by the finder of fact"). Here, knowledge of how police generally are instructed to use firearms and respond to citizens with firearms would assist jurors when deciding whether the defendant officers' actions were reasonable. *See, e.g., Kopf v. Skyrm*, 993 F.2d 374, 379 (4th Cir. 1993) (noting that a juror's everyday experience may not be sufficient to assess reasonableness in cases involving firearms).

Based on Kapelsohn's experience working with police officers and attending numerous conferences and seminars on topics related to police use of force, he is qualified to render an opinion on this subject.[2] *See Jones v. Allen*, No. PX-15-1173, 2016 WL 9443772, at *3 (D.Md. Oct. 24, 2016) (finding Kapelsohn qualified to testify on the standard a reasonably well-qualified officer would be expected to meet). Plaintiffs do not suggest otherwise. Instead, they argue that Kapelsohn's conclusions on national use of force standards are inextricably intertwined with opinions he is neither qualified nor permitted to render and, as such, must be excluded.

When testifying as to whether certain behavior complies with professional standards, an expert is permitted to rely on hypothetical scenarios that are supported by the evidence. *See Cacciola v. McFall*, 561 Fed.Appx. 535, 538 (7th Cir. 2014) (finding testimony permissible where expert "spoke about proper police practices, and the factors relevant to the hypothetical uses of force, without applying them to [the] case"); *Potts v. Manos*, No. 11 C 3952, 2017 WL 4365948, at *5 (N.D.Ill. Sept. 29, 2017) (citing *Cacciola*); *Redd v. Ward*, No. 312-cv-00070-RLY-WGH, 2014 WL 12755052, at *2 (S.D.Ind. Aug. 1, 2014) ("[T]he Expert may testify in this case about proper police practices and hypothetical situations" but the expert "may not address the application of these practices to this case."). However, when an expert's opinion is based on his own credibility determinations, rather than factual assumptions, it must be excluded. *See Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 88158, at *6-7 (N.D.Ill. Jan. 11, 2012).

In *Jordan*, the expert spent the majority of his report explaining which witnesses' recollection of events he believed to be true. The expert then premised his professional standards opinions on that evaluation. *Id*. at *5-6. The court found that it was "simply not feasible to

---

[2] According to Kapelsohn's curriculum vitae, he has served as a "reserve deputy sheriff" and spent "hundreds of hours accompanying police and security officers and/or participating in patrol and enforcement activities throughout the United States." (Dckt. #212-1 at 5, 32). He has also attended many conferences and seminars that apparently touched on use of force standards. (*Id.* at 35-45).

extract non-credibility opinions from the credibility opinions in [the expert's] report given that the entire report is premised on his evaluation of which witnesses are believable." *Id.* at *6. Conversely, in *Richman v. Sheahan*, 415 F.Supp.2d 929, 941-44 (N.D.Ill. 2006), the court excluded credibility commentary made by an expert, but determined that the expert's remaining testimony was admissible because it constituted an opinion based on factual assumptions (the defendants' version of events).

Plaintiffs argue that, as in *Jordan*, Kapelsohn's opinions on national police standards are "rendered essentially useless" by the impermissible credibility determinations made throughout his report. (Dckt. #212 at 19). The Court agrees that Kapelsohn appears to have trouble disentangling his "professional" opinions from his personal views of the case. Even so, the Court finds that, as in *Richman*, Kapelsohn's proposed testimony is proper to the extent that it is based on hypothetical scenarios supported by the evidence. Thus, while Kapelsohn will be permitted to testify on national police standards and practices, he may *not* premise those opinions on the assumption that "the involved officers are accurately recounting what they perceived," as he repeatedly purports to do throughout his report. Such a premise inherently requires a credibility determination, as the officers' accounts in this case differ in a highly significant way (O'Brien saw Cole-Garrit point a gun a second time; Bansley did not). To avoid any appearance that Kapelsohn is lending credence to one witness account over another, he may only testify as to whether certain actions in hypothetical scenarios presented to him at trial comply with national standards. Defense counsel is ordered to confine Kapelsohn's testimony "to describing sound professional standards and identifying departures from them," as is permissible. *West v. Waymire*, 114 F.3d 646, 652 (7th Cir.1997).

2.      **Kapelsohn may testify regarding the shooting capabilities of pistols, but he may not testify regarding the shooting capabilities of the particular firearm allegedly found at the scene.**

According to Kapelsohn's report, the 9mm Taurus PT 92 pistol that defendant officers allegedly found at the scene "has a manual safety that could be engaged upward when the pistol's hammer is cocked, allowing the pistol to be carried 'cocked and locked.'  When carried hammer down, this pistol can be fired double-action for its first shot."  (Dckt. #212-1 at 10).  Kapelsohn further notes that the pistol was discovered with its hammer down and the safety manual engaged, a condition in which it can be fired "in a fraction of a second."  (*Id.* at 10-11).

Plaintiffs argue that the information regarding the exact firearm allegedly carried by Cole-Garrit is irrelevant because when the officers decided to apply deadly force, they had no way of knowing what type of weapon Cole-Garrit was carrying or what condition he was carrying it in.  The Court agrees.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  As the Seventh Circuit explained:

> Knowledge of facts and circumstances gained after the fact . . . has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment.  Were the rule otherwise . . . the jury would possess more information than the officer possessed when he made the crucial decision.

*Sherrod v. Barry*, 856 F.2d 802, 805 (7th Cir.1988) (en banc).  Kapelsohn's report seems to suggest that the weapon allegedly carried by Cole-Garrit was more dangerous than the average pistol, or at least could be fired more quickly.  Even if this knowledge could have altered the officers' decision-making process, it remains irrelevant to the reasonableness analysis because they did *not* know what type of firearm Cole-Garrit allegedly carried at the time of the incident.  Kapelsohn may not testify regarding the characteristics of this specific firearm nor the condition in which it was found.

Still, because the officers allege that they had seen Cole-Garrit in possession of a pistol when they decided to apply deadly force, the Court will permit Kapelsohn to testify as to how quickly pistols generally can be fired when carried in various conditions (safety on, single-action, etc.). The average juror is likely unaware of this information, which is relevant to the question of whether a reasonable officer would conclude that Cole-Garrit posed a threat of death or serious injury. Kapelsohn's extensive experience with firearms qualifies him to testify on this subject. (Dckt. #212-1 at 30-35); *see Jones*, 2016 WL 9443772, at \*5.

### 3. Kapelsohn may testify as to the shooting capabilities of the officers' weapons.

Plaintiffs argue that the make, model, and condition of the officers' pistols is also irrelevant, as it is undisputed that the officers fired their pistols on the night in question. (Dckt. #212 at 9). Applying the same analysis described above, the Court finds otherwise. Reasonableness is judged "in light of all that the officer knew." *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994). At the time they decided to fire at Cole-Garrit, defendant officers were aware of the make, model, and condition of their own weapons. Perhaps this information factored into their decision to fire. The Court will not preclude this testimony.

### 4. Kapelsohn may testify regarding the "electronic timing" tests he conducted with the defendant officers.

In the "electronic timing" section of his report, Kapelsohn describes the testing he conducted to determine how quickly the defendant officers could fire guns similar to those they carried on the night in question. (Dckt. #212-1 at 22). The Court finds this information is relevant, as the speed at which these officers are capable of discharging weapons could help the jury determine whether the number of shots that they fired on the night in question was reasonable. *See Lopez v. Chula Vista Police Dept.*, No. 07-cv-1272-WQH-BLM, 2010 WL

685014, at *2 (S.D.Cal. Feb. 18, 2010) (denying, without prejudice to renew at trial, relevancy

objection to portions of report concerning the speed with which a subject can pull a gun and fire).

The testing methods Kapelsohn employed (timing each officer at a firing range while they

discharged the same number of bullets as they fired at Cole-Garrit) were sufficiently reliable.

*C.f. Jones*, 2016 WL 9443772, at *4 (noting "the inherent problems . . . based on testing

performed in conditions vastly different than those at the scene").  Plaintiffs may explore any

shortcomings – such as the fact that the officers did not use the exact pistols they carried on

August 19, 2014, during Kapelsohn's tests – on cross-examination.  *See Gayton v. McCoy*, 593

F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the

adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents

through cross-examination.").[3]

The four opinions described above are the only opinions which: (1) Kapelsohn is

qualified to render; (2) are supported by reliable methodology; and (3) will assist the trier of fact.

Accordingly, Kapelsohn's testimony must be limited to this narrow framework at trial.

**D.**    **The remainder of Kapelsohn's proposed testimony is barred.**

**1.**    **Kapelsohn may not testify as to whether the officers' conduct was
consistent with the Chicago Police Department's use of force policies.**

While there are instances where national police standards are relevant to excessive force

claims, "evidence of purely localized police procedure is less likely to be helpful."  *Brown*, 871

F.3d at 538; *see also Todero v. Blackwell*, No. 117-cv-01698JPHMJD, 2020 WL 5542440, at *2

(S.D.Ind. Sept. 16, 2020) (permitting expert to testify on national guidelines, but precluding

---

[3] While Kapelsohn may testify as to how quickly these particular officers are capable of firing, he may
not testify that "officers who fire in what they perceive to be life-threatening, close-range situations fire as
quickly as they can," as he did in his deposition.  (Dckt. #212-2 at 15).  This testimony is precluded for
the same reasons described in Section III(D)(7), *infra*.

testimony as to whether a particular city had adopted those guidelines).  As the Seventh Circuit has recognized, "a police officer's compliance with the rules of his department is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirements." *Brown*, 871 F.3d at 537; *see also Hinch v. O'Connor*, No. 15 C 9316, 2018 WL 925119, at *6 (N.D.Ill. Feb. 15, 2018) ("[A]s the Seventh Circuit has made clear, whether or not an officer complies with police department general orders is irrelevant on the question of whether the officer's use of force violates the Constitution."); *Potts*, 2017 WL 4365948, at *4 (excluding expert testimony regarding Cook County use of force policies in excessive force case because the opinion would not shed light on "whether defendants behaved unreasonably in a way that violated plaintiff's constitutional rights").

Indeed, in *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006), the Seventh Circuit specifically found that whether the defendant officer's conduct conformed with CPD General Orders pertaining to the appropriate use of force was irrelevant to the question of whether the officer's actions were reasonable under the Fourth Amendment.  The Court went so far as to state that "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Id.*  Evidence that officers Bansley and O'Brien acted in accordance with those same orders must also be excluded here.  Notably, defendants themselves agree that testimony on CPD policies is not relevant to whether the officers' actions were reasonable.[4]  (Dckt. #216 at 10).

---

[4] Defendants maintain, however, that Kapelsohn should be allowed to testify "that the underlying policy is in keeping with the relevant legal standards at issue" if he is asked about CPD policies on cross-examination.  First, Kapelsohn may not testify regarding "legal standards."  *See* Section III(D)(3), *infra*. Moreover, the opportunity for questioning on cross examination "is not a basis for allowing otherwise inadmissible [expert] testimony to be admitted."  *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387

## 2. Kapelsohn may not testify regarding the training that Bansley and O'Brien received from the Chicago Police Department.

When preparing for this case, Kapelsohn reviewed the defendant officers' five-year employee complaint histories, incident reports, and internal affairs records. (Dckt. #212-1 at 4). Plaintiffs note that he did not review the officers' individual training records, nor has he ever personally trained CPD officers. (Dckt. #212 at 22). Defendants do not contradict these assertions. Instead, they argue that Kapelsohn is qualified to testify as to whether these officers' actions "were in keeping with their training," because he has been involved in the training of officers in other jurisdictions and "has reviewed the CPD policy underlying the use of deadly force." (Dckt. #216 at 10). The Court disagrees and finds that Kapelsohn's report does not establish a foundation that would allow him to opine on these officers' training specifically. Furthermore, Kapelsohn's opinions regarding the officers' individual training are irrelevant for the same reasons his opinions on the CPD's use of force policies are irrelevant. *Cole v. Perry*, No. 1:16-cv-3081-WTL-MJD, 2019 WL 2210809, at *2 (S.D.Ind. May 22, 2019) ("Testimony addressing whether [defendant] acted in accordance with [Indianapolis Metropolitan Police Department] training and policy would potentially confuse the jury, which should instead focus on the question of whether [defendant] complied with the Fourth Amendment.").

## 3. Kapelsohn may not testify regarding any case law or statutes.

Kapelsohn may not offer opinions as to whether the officers' use of force violated the standards established in *Graham v. Connor*, *United States v. Brown*, or any other case, as he does in his report. (Dckt. #212-1 at 11-12). "[I]t is the Court's responsibility alone to instruct the jury on the law." *Becker v. City of Evansville*, No. 3:12-cv-00182, 2016 WL 6395868, at *6

---

F.Supp.2d 794, 800 (N.D.Ill. 2005), *amended*, No. 01 C 9389, 2005 WL 8178971 (N.D.Ill. Sept. 8, 2005); *see also Reed v. City of Chicago*, No. 01 C 7865, 2006 WL 1543928, at *3 (N.D.Ill. June 1, 2006) (same).

(S.D.Ind. Oct. 28, 2016); *see also Andersen v. City of Chicago*, 454 F.Supp.3d 808, 819 (N.D.Ill. 2020) (excluding expert testimony where the bulk of his opinion "amount[ed] to an instruction on the law and application of the law to the facts").

### 4. Kapelsohn may not testify that, taken together, the evidence is consistent with the officers' accounts of the night in question.

In his second overarching conclusion, Kapelsohn states that everything he has observed in the physical evidence and his testing is consistent with the officers' accounts of the incident. (Dckt. #212-1 at 24). Such testimony "does nothing more than instruct the jury on how they ought to evaluate witnesses' testimony" and must be excluded. *Richman*, 415 F.Supp.2d at 942 (precluding expert from testifying that "physical evidence, official investigative reports, majority of witness statements, and autopsies" undermined witness accounts); *see also Potts*, 2017 WL 4365948, at *6 (precluding expert's testimony that "none of the evidence he has seen shows that defendants used excessive force or otherwise acted unreasonably toward plaintiff"); *White v. Geradot*, No. 1:05-cv-382, 2008 WL 4724004 at *3 (N.D.Ind. Oct. 24, 2008) (precluding testimony that "the wounds on the body strongly support [detective's] account of the incident, and the subsequent investigation," because it improperly bolstered the detective's credibility and invaded the province of the jury). Kapelsohn's blanket statement that the evidence, taken together, supports the officers' accounts of events is a thinly veiled effort to tell the jurors which result they should reach. This is improper. *See Cooper v. City of Chicago Heights*, No. 09 C 3452, 2011 WL 2116394, at *7 (N.D.Ill. May 27, 2011); *Rivera v. Heck*, No. 16-cv-673-wmc, 2018 WL 4354949, at *5 (W.D.Wis. Sept. 12, 2018).

### 5. Kapelsohn may not testify about topics that require medical expertise.

Kapelsohn's statement that the "most likely mechanism of physiological incapacitation from handgun wounds is blood loss" requires specialized knowledge of human physiology that

Kapelsohn does not possess. The fact that he conveys this information to officers when training them does not render him qualified to share such information with a jury. *See Robinson*, 2017 WL 564682, at \*16 (finding that an expert who taught about memory and recall issues was nonetheless unqualified to render testimony on these subjects without a scientific background). An expert, however well-credentialed he may be, may not simply parrot the opinions of experts in different fields. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). Kapelsohn's lack of familiarity with the methods and reasons underlying those opinions precludes any exploration of their validity on cross-examination. *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (The rationale permitting expert witnesses to rely on hearsay is not satisfied "where the expert failed to demonstrate any basis for concluding that another individual's opinion . . . was reliable"). Kapelsohn's explanation of which areas of the body must be shot to render a person physically unable to fire a weapon from the ground (Dckt. #212-1 at 17) is similarly impermissible. .

**6. Kapelsohn may not testify about Cole-Garrit's autopsy.**

Kapelsohn's report includes a description, apparently pulled directly from the autopsy report, of each gunshot wound identified in Cole-Garrit's autopsy. (Dckt. #212-1 at 9). He notes that his "cursory inspection of the deceased's clothing and footwear indicated bullet defects that were generally consistent with the autopsy report regarding the deceased bullet wounds." (*Id.* at 11). Defendants argue that this "is not an opinion," but rather a "statement" describing a step in Kapelsohn's analysis. (Dckt. #216 at 12). There is no reason, according to defendants, "to preclude Mr. Kapelsohn from recounting what he viewed and reviewed on this case if he is asked." (*Id.*). The Court disagrees.

It is not an expert's role to give a summary of the relevant facts from the witness stand, regardless of whether he reviewed them when developing his opinion. "[T]his is what a lawyer does in his or her summation to the jury. This is not the function of an expert witness." *Lippe v. Bairnco Corp. et al.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (precluding expert testimony where expert sought to "summarize the relevant facts (as to which he had no personal knowledge)" and then render an opinion on defendants' intent). Because Kapelsohn is neither a medical professional nor a forensic pathologist, he is not qualified to render an opinion as to what the autopsy shows or summarize the autopsy to the jury.

Specialized expertise is also necessary to render an opinion on bullet trajectory (for example, which holes in clothing correspond to which bullet wounds). *Dean v. Watson*, No. 93 C 1846, 1996 WL 88861, at *2-3 (N.D.Ill. Feb. 28, 1996) (requiring an expert to demonstrate extensive experience or formal training in bullet trajectory before testifying as to which holes in clothing were caused by the entrance and exit of a bullet). Other than a 2008 certificate in "Shooting Scene Reconstruction" from a police department in Oregon, Kapelsohn's curriculum vitae shows nothing to suggest he is qualified to testify on bullet trajectory. *See Chatman v. City of Chicago*, No. 13 C 5697 (N.D.Ill.), Dckt. #225 (Transcript), at 4 (finding that Kapelsohn is not a forensic pathologist and "has no expertise in bullet trajectory").

### 7. Kapelsohn may not testify regarding officers' ability to respond to stimuli or their psychological reactions to stress.

The section of Kapelsohn's report summarizing the principle that "action is quicker than reaction," essentially describes how long it takes the human brain to process stimuli before the body can react to them. This opinion implies a scientific knowledge of the human brain. Kapelsohn is not a scientist or a neurologist. Instead, he has completed several "force science" courses and labels himself a "Force Science Analyst and Advanced Specialist in Force Science."

(Dckt. #212-1 at 6). The field of "force science," according to Kapelsohn, "is the application of scientific principles, research, and testing to confrontations in which force is used by police officers or others." (*Id.*).

Without dismissing the field entirely, federal courts confronted with force science-based opinions have routinely determined that witnesses with "force science" training are not qualified to render scientific opinions. *See, e.g., Finch v. City of Wichita, Kansas*, No. 18-1018-JWB, 2020 WL 3403121, at *22 (D.Kans. June 19, 2020) (noting that "force science" "appears to be more of a trademark than the name of a field of scientific study"); *Green v. City of Mission*, No. 7:18-CV-49, 2019 WL 3217033, at *4 (S.D.Tex. July 17, 2019) (finding defendants did not provide objective validation for the techniques relied on by the Force Science Institute in general or in the specific certification course completed by the witness); *Cole v. Perry*, No. 1:16-cv-3081-WTL-MJD, 2019 WL 4165304, at *6 (S.D.Ind. Apr. 30, 2019), *on reconsideration*, 2019 WL 2210809 (finding Force Science Institute instructor was not an expert in the academic field of behavioral science); *Dominguez v. City of Los Angeles*, No. CV 17-4557-DMG (PLAx), 2018 WL 6164278, at *7-8 (C.D.Cal. Oct. 9, 2018) (excluding testimony on reaction time where former police officer had received a certificate in "force science" analysis). The Court finds that Kapelsohn's training does not render him qualified to opine on the human brain's capabilities. *See Chatman*, *supra*, Dckt. #225 at 5 (finding that Kapelsohn's opinions on action vs. reaction, among others, were not based in science).

Kapelsohn's force science training also does not qualify him to testify that, when faced with "highly stressful, uncertain, rapidly changing incidents," most officers would be unable to determine that a threat has stopped and cease firing in less than 1.3 seconds. (Dckt. #212-1 at 18). Kapelsohn may not testify at all as to how the human brain responds to stress. In fact,

17

Kapelsohn has previously been precluded from offering a similar opinion due to his lack of scientific expertise or identifiable methodology. *Jones*, 2016 WL 9443772, at *4 ("Mr. Kapelsohn provides no scientific or methodologically sound foundation to support an opinion regarding the complex human factors that may have affected the officers on-the-scene shot times. Nor have Defendants established that Mr. Kapelsohn's training and experience in the field of "force-science" can meet the *Daubert* standard.").[5]

### 8. Kapelsohn may not testify as to why one officer saw Cole-Garrit point his gun a second time, but the other officer did not.

Kapelsohn devotes an entire section of his report to his conclusion that "[i]t is not surprising that, once the pursuit was in progress, Officer O'Brien has testified he saw Garrit point the pistol at Officer Bansley, but Bansley did not see this." (Dckt. #212-1 at 18). To support this opinion, he cites possible reasons for the inconsistency, such as the fact that Bansley may have "momentarily diverted his attention, as he should, to look ahead of him, to keep from tripping over some object, hole or irregularity in the pavement in his path." (*Id.*). This is nothing more than inadmissible speculation. *Cooper*, 2011 WL 2116394, at *7; *Maryland Shall Issue, Inc. v. Hogan*, No. ELH-16-3311, 2021 WL 3172273, at *4 (D.Md. July 27, 2021).

In any event, there is "no more certain test" for determining if an expert's testimony is permissible than the "common-sense inquiry" of whether an untrained layperson could intelligently reach a conclusion without the help of someone with specialized knowledge.

---

[5] Defendants argue that even if Kapelsohn is not a scientific expert, he is qualified to testify about "force science" principles because "they are part of the training foundation for law enforcement in use of force training." (Dckt. #216 at 13). Again, the fact that an individual instructs others on scientific principles does not render him qualified to explain such principles to a jury. *See Finch v. City of Wichita, Kansas*, 18-1018-JWB, 2020 WL 3403121, at *22 (D.Kan. June 19, 2020) (Force science instructor "may have read studies or attended courses relating to attention and memory, but no showing is made that he has the training, experience, or learning necessary to make informed judgments about issues within specialized fields of the behavioral sciences such as psychology and cognitive science").

Fed.R.Evid. 702, Advisory Committee Notes.  Jurors are certainly capable of understanding the

human need to occasionally look down while running without Kapelsohn's assistance.  Because

this factual dispute is within a jury's common understanding, expert testimony is unnecessary.

*United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) (finding "expert" testimony based

solely on third-party observations "that are adequately comprehensible to lay people" would be

improper to admit).  Furthermore, "expert witnesses are not allowed to sort out possible

conflicting testimony or to argue the implication of those consistencies.  That is the role of the

lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears."  *Davis v.

Duran*, 277 F.R.D. 362, 370 (N.D.Ill. 2011).[6]

> **9.    Kapelsohn may not testify regarding whether the gun allegedly found
> at the scene is the item pictured in a Facebook photograph of Cole-
> Garrit.**

!        Again, "[c]ourts agree that it is improper to permit an expert to testify regarding facts that

people of common understanding can easily comprehend."  *Lundy*, 809 F.2d at 395.  Laypeople

are more than capable of comparing a physical gun to an item featured in a photograph.  *See

Crabbs v. Pitts*, No. 2:16-cv-0387, 2018 WL 5262397, at *7 (S.D.Ohio Oct. 23, 2018)

(precluding expert's testimony that when reviewing cruiser video he "saw nothing to suggest or

indicate the video was not an accurate characterization of what occurred" where expert had no

special qualifications in determining whether a video had been altered); *Hoffman v. Caterpillar,

Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (affirming exclusion of expert's testimony that plaintiff

could operate a high-speed scanner based on his viewing of a videotape because the videotape

---

[6] Defendants assert that they do not seek to have Kapelsohn offer this opinion in his direct testimony, but
he "should be allowed to explain why this might occur and to opine that he was aware of this and it
factored into his opinion," should plaintiffs bring up the officers' conflicting accounts on cross-
examination  (Dckt. #216 at 14).  Once more, inadmissible expert testimony does not become admissible
merely because it is offered on cross-examination.  *Supra*, at n.4.

could be played for the jury and "the jury could then draw [its own] inferences . . . and expert testimony would be of no help"). Thus, Kapelsohn's opinion that the gun allegedly found at the scene is the item pictured in a photograph would only serve to improperly tell the jurors how they should interpret the evidence before them.

### 10. Kapelsohn may not testify about "ejection pattern testing."

Regarding the "ejection pattern testing," Kapelsohn himself admits that "no issue has been raised by plaintiffs as to the ejection patterns of the officers' pistols in this case, or the locations of the officers when they fired." (Dckt. #212-1 at 23). He also provides several reasons why the locations of the officers' ejected cartridge cases would *not* provide reliable information here. Even so, he somehow concludes that "the recovered locations of the ejected cartridge cases from the officers' handguns are generally consistent with their accounts of what occurred in the incident." (*Id.* at 24). Because Kapelsohn fails to adequately explain how his methodology supports this conclusion or why this conclusion will be relevant and helpful to the jury, he may not testify regarding ejection pattern testing. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) (noting that Rule 702 requires an expert to "explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'").[7]

### 11. Kapelsohn may not testify regarding the credibility or relevance of Emmanuel Spann's testimony.

On October 7, 2020, Kapelsohn updated his report to include opinions on the testimony of Emmanuel Spann. (Dckt. #212-3). He first notes that "it is of course up to the finder of fact [i.e., the jury] to determine the credibility to assign to each account and witness." (*Id.* at 2). He

---

[7] If plaintiffs raise an issue as to where the defendant officers were standing when they fired and attempt to use the location of the shell casings at the scene to demonstrate their theory, Kapelsohn may testify as to how different methods of carrying a firearm may affect where cartridges land. His extensive firearms experience and his observations of the shooting techniques of the defendant officers qualifies him to render this testimony.

then promptly usurps that role by citing Spann's criminal history as evidence that he is not a credible witness. "[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury – determining the credibility of witnesses." *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999). "[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) *amended in part on other* grounds, 957 F.2d 301 (7th Cir. 1992). As to the relevancy of Spann's testimony, Kapelsohn writes that "[t]he issues in this case have to do primarily with the actions of Mr. Garrit while running with a gun in his hand that either justified, or did not justify, the police in firing, and as to those issues Mr. Spann has little or nothing to offer, as he didn't see that part of the incident." (*Id.* at 1). It is the court's role to determine whether evidence is relevant. Fed.R.Evid. 401. It is the role of the expert to apply reliable methodology to the facts.

### 12. Kapelsohn's opinions rebutting the testimony of Dennis Waller are inadmissible.

Plaintiffs argue that Kapelsohn's opinions rebutting the testimony of plaintiff's expert witness Dennis Waller invade the province of the Court and the jury. Indeed, each "finding" in this section of Kapelsohn's report constitutes an impermissible opinion as to who is credible and what information is relevant to this case. Kapelsohn writes:

> The fact that the DOJ report has criticized the CPD's investigation of officer-involved shootings is not determinative of – or even, I believe, relevant to – this matter.

> Mr. Waller's criticism about the tactics used by the officers in driving their vehicle close to Garrit is, I believe, Mr. Waller's own opinion, and nothing more.

> Mr. Waller tries to make much of the fact that four officers . . . heard that people riding bicycles were transporting guns in the neighborhood . . . . It is, I believe, irrelevant whether the officers had heard about bicycle transportations of guns . . . .
>
> Finally, there is the issue of whether the officers 'had it in for Garrit,' or were harassing, threatening, stalking or pursuing him. This is another non-issue.

(Dckt. #212-1 at 20-21). According to *Daubert*, Rule 702 confides *to the courts* the responsibility to ensure that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. Courts fulfill this gatekeeping function by reviewing *Daubert* motions, such as the one before it now. On March 26, 2021, this Court granted the parties in this case leave to file *Daubert* motions on or before March 31, 2021. (Dckt. #210). Now that the deadline has passed, defendants apparently plan to file a motion in limine to exclude Waller's testimony. (Dckt. #216 at 16). This is impermissible. "A *Daubert* motion cannot be re-titled to avoid the meeting of pre-established deadlines." *Gov't Employees Ins. Co. v. KJ Chiropractic Ctr. LLC*, No. 6:12-cv-1138-Orl-40DAB, 2015 WL 12838853, at *2 (M.D.Fla. Jan. 15, 2015); *see also Rutz v. Novartis Pharmaceuticals Corp.*, No. 12-cv-0026-MJR-PMF, 2013 WL 1412276, at *1 (S.D.Ill. Apr. 8, 2013) (motions in limine requiring *Daubert* analysis were denied as untimely).

After failing to comply with the Court's timeline, defendants may not now use Kapelsohn to argue that Waller's opinions are premised on irrelevant evidence. Expert witnesses may testify as to the "acceptability, accuracy, and reliability of the *method and techniques* used by other experts and the adequacy of their qualifications." *United States v. Wells*, No. 3:13-CR-00008-SLG, 2019 WL 3229912, at *5 (D.Alaska July 17, 2019) (finding expert could not testify as to whether opposing expert was influenced by confirmation bias) (emphasis added). They may not, however, testify as to the *relevancy* of the evidence on which another expert relies. That is a question for the Court – just as credibility is a question for the jury.

> **13.    Kapelsohn may not testify as to whether, based on the officers'
> accounts of the incident, a reasonable officer would have used deadly
> force under the same circumstances.**

Finally, Kapelsohn concludes in his report that "provided the officers are accurately

describing what they perceived during the incident, their use of deadly force was such as other

'reasonable officers at the scene' would have made under the same totality of circumstances as

confronted them that night." (Dckt. #212-1 at 24-25). The Court first notes that this statement is

speculative. It is one thing for an expert to testify that a reasonable officer *might* apply deadly

force in a particular scenario; it is quite another to unequivocally testify that he or she *would*.

There are likely very few scenarios in which the only reasonable response of a police officer is to

apply deadly force. Such a suggestion is not only unsupported by reliable methodology, but

would be highly prejudicial. "Unless the expertise adds something, the expert is at best offering

a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to

control under Rule 403." *See United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).

The Court further finds this testimony would not help the trier of fact. An expert opinion

"is not objectionable just because it embraces an ultimate issue." Fed.R.Evid. 704. However,

experts may not "draw conclusions *for* the fact finder when no help is needed." *Brown*, 871 F.3d

at 539 (precluding expert testimony on whether use of force was reasonable) (emphasis in

original). In *Brown*, the Seventh Circuit distinguished between expert testimony on standard

police procedures and expert testimony on "the ultimate question of objective reasonableness."

Regarding the latter, the Court found such testimony would "merely tell the jury what result to

reach" and must be precluded. *Id*. Kapelsohn will be permitted to testify regarding general

police standards and whether hypothetical actions would constitute a departure from those

standards. Additional testimony on reasonableness more generally would add nothing helpful to

this analysis. *See Thomas v. Landrum*, No. 11 C 09275, 2014 WL 11370447, at *1 (N.D.Ill. Mar. 18, 2014) ("Although expert opinions are not objectionable 'just because' they 'embrace[ ] an ultimate issue,' very often that type of opinion will not help the trier of fact understand evidence or determine a fact in issue, which is the basic precondition for permitting expert testimony.") (internal citations omitted).

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to exclude Kapelsohn's testimony (Dckt. #212) is granted in part and denied in part with respect to four narrow issues. In particular, Kapelsohn will be permitted to offer testimony regarding: (1) how generally accepted national police standards regarding the use of force apply to hypothetical scenarios; (2) how quickly a person armed with a pistol can generally fire the weapon; (3) the shooting capabilities of the officers' weapons; and (4) how quickly the defendant officers are capable of firing weapons, based on his testing. Plaintiffs' motion to exclude Kapelsohn's testimony is otherwise granted.


**ENTERED:   January 13, 2021**

**Jeffrey I. Cummings**
**United States Magistrate Judge**